# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

Juan Gregorio Fuentes-Lopez,

    Plaintiff

v.

Alondra Crystal Garcia,

    Defendant

Case No.: 2:24-cv-00890-JAD-DJA

**Order Denying Petition for Return of Minor Child and Closing Case**

[ECF No. 1]

    Plaintiff Juan Gregorio Fuentes-Lopez, a dual citizen of Mexico and the United States, sues his ex-wife Alondra Crystal Garcia under the 1980 Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act for the return of their 11-year-old daughter L.A.F.G. to Mexico. I previously granted several extensions of time in this case because Garcia was seeking counsel, and I eventually appointed the Federal Public Defender's Office to represent her. On December 4–5, 2025, the court conducted a bench trial during which Fuentes-Lopez, Garcia, L.A.F.G.'s former teacher and track coach, and some of Garcia's family members testified. The court also conducted an in camera interview of L.A.F.G.

    With the benefit of this testimony and the parties' submitted evidence and arguments, I conclude that Fuentes-Lopez has met his burden to show that L.A.F.G.'s removal was wrongful. But I find that Fuentes-Lopez filed his petition in this court after the Convention's one-year deadline had passed, and L.A.F.G. is now well settled in this country. So I decline to exercise my discretion to order the child's return to Mexico under the Hague Convention's well-settled defense, and I thus deny Fuentes-Lopez's petition.

**Discussion**

**A.    Legal standard**

The 1980 Hague Convention on the Civil Aspects of International Child Abduction was created to "secure the prompt return of children wrongfully removed to or retained in" any signatory country.[1] "A court that receives a petition under the Hague Convention may not resolve the question of who, as between the parents, is best suited to have custody of the child. With a few narrow exceptions, the court must return the abducted child to its country of habitual residence so that the courts of *that* country can determine custody."[2] This court's focus is more narrow:

> "A court [determining whether a child was wrongfully removed must] answer a series of four questions: (1) When did the removal or retention at issue take place?  (2) Immediately prior to the removal or retention, in which state was the child habitually resident?  (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence?  (4) Was the petitioner exercising those rights at the time of the removal or retention?"[3]

The petitioner must establish the merits of a wrongful-removal petition by a preponderance of the evidence.[4]

But even if a petitioner establishes the merits of a wrongful-removal petition, the court has discretion not to order return under several exceptions.  The respondent raises three.  The

---

[1] The Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention), Oct. 25, 1980, art. 1, T.I.A.S. No. 11670.  The parties agree that the United States and Mexico are signatories to the Convention.  *See* ECF No. 1 at 2, ¶ 5; ECF No. 11 at 2, ¶ 5.

[2] *Cueller v. Joyce*, 596 F.3d 505, 508 (9th Cir. 2010).

[3] *Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001), *abrogated on other grounds by Monasky v. Taglieri*, 589 U.S. 68 (2020).

[4] 22 U.S.C. § 9003(e)(1)(A).

2

first is often referred to as the "well-settled exception." The court may decline to order the child's return if the petitioner filed his request for return more than a year after the minor's wrongful removal and the minor has become settled in her new environment.[5] The second defense, often referred to as the "maturity" or "child's wishes" exception, gives the court discretion to "refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of [her] views."[6] The respondent must prove by a preponderance of the evidence that either of those exceptions applies.[7] And third, the court may refuse to order the child's return if "there is a grave risk that . . . her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."[8] The respondent must show by clear and convincing evidence that the grave-risk exception applies.[9]

**B.      Fuentes-Lopez has established that L.A.F.G. was wrongfully removed from Mexico.**

   *1.     L.A.F.G.'s July 2022 removal was wrongful.*

Garcia and L.A.F.G. arrived in Las Vegas on July 8, 2022, after Fuentes-Lopez and his family locked them out of the home that they previously shared with him in Tijuana, Mexico.[10] Garcia testified that, before traveling to Nevada, she and L.A.F.G. went to a motel in Tijuana for a few days, then stayed with Garcia's sister in Southern California. Garcia did not obtain

---

[5] Hague Convention, art. 12.

[6] *Id.* at art. 13.

[7] 22 U.S.C. § 9003(e)(2)(B).

[8] Hague Convention, art. 13(b).

[9] 22 U.S.C. § 9003(e)(2)(A).

[10] Garcia's testimony that Fuentes-Lopez or his family locked her and L.A.F.G. out of their home and left their possessions on the front lawn is uncontroverted. In her interview, L.A.F.G. become emotional when describing that event.

3

Fuentes-Lopez's consent or permission to leave Mexico with L.A.F.G. On August 1, 2022, Garcia filed a motion for an "emergency move-away court order" in Mexico's family court, informing the court that she and L.A.F.G. had moved to Henderson, Nevada.[11] But there's no indication in the record that the Mexico court granted that motion. And the fact that Garcia filed it indicates that she knew she needed to seek permission to leave the country in light of the ongoing proceedings in that court.

Both parties rely on the Mexico court's "Arriago order," an order issued in October 2022 that restrained Garcia from "leaving the jurisdiction of the court unless respondent provides an attorney-in-fact sufficiently informed and financially able to respond to the court orders."[12] Fuentes-Lopez contends that this order prohibited Garcia from moving to the United States. But Garcia testified that she had an attorney in Mexico and that she was thus not prohibited from leaving Mexico. I find that the effect of the Arriago order has limited relevance here. But when considering all of the relevant evidence, I conclude that Garcia wrongfully removed L.A.F.G. when she left Mexico without Fuentes-Lopez's consent.

### 2. *Fuentes-Lopez had custody rights and was exercising them when L.A.F.G. was removed.*

It appears undisputed that Fuentes-Lopez had custody rights when L.A.F.G. was removed and that he was actively exercising those rights. In January 2022, the family court in Mexico issued an order acknowledging the need to determine the parents' custodial rights following their divorce and ordering L.A.F.G. to appear at court for an interview to determine her best

---

[11] Ex. 504.

[12] Ex. 4.

interests.[13] L.A.F.G. participated in that interview in March 2022.[14] Fuentes-Lopez participated in that ongoing custody case and sought orders in that case requiring Garcia's return and for in-person visitation with L.A.F.G.[15] Fuentes-Lopez has shown by a preponderance of the evidence that he had custody rights and was exercising them when L.A.F.G. was removed.

### 3.  *Mexico was the child's state of habitual residence immediately prior to L.A.F.G.'s removal.*

Determining a child's habitual residence "is a fact-driven inquiry" that must be "sensitive to the unique circumstances of the case and informed by common sense."[16] "In general, a child's habitual residence is 'the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective.'"[17] "This approach considers a child's experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered."[18] Courts also consider the "settled intention of the parents" when determining where the child habitually resided immediately prior to removal.[19]

---

[13] Ex. 2; *see also* Ex. 5 (custody order acknowledging that Fuentes-Lopez "never lost legal custody rights").

[14] Ex. 3.

[15] Exs. 4, 5.

[16] *Monasky*, 589 U.S. at 78 (2020) (citation omitted).

[17] *Nisbet v. Bridger*, 124 F.4th 577, 584 (9th Cir. 2024) (quoting *Karkkainen v. Kovalchuk*, 445 F.3d 280, 291–92 (3d Cir. 2006)).

[18] *Id.*

[19] *Mozes*, 239 F.3d at 1078–79.

Here, the testimony showed that Fuentes-Lopez, Garcia, and L.A.F.G. lived in Tijuana, Mexico from approximately January 2019 until July 2022. L.A.F.G. lived and slept in a home that Fuentes-Lopez rented and went to a Montessori school located in Tijuana, though many of those classes were online because of the COVID-19 pandemic. She also maintained friendships with her classmates and had them over to her house for playdates. Fuentes-Lopez testified that L.A.F.G. participated in extracurricular activities like ballet, karate, gymnastics, and track-and-field in Tijuana.

Despite the undisputed fact that L.A.F.G. lived and went to school in Mexico, Garcia contends that her habitual residence was in the United States. Garcia testified that she and L.A.F.G. would frequently cross the border to San Diego for extracurricular activities, to shop, to go to parks, and to visit family members who lived in California. Most of her medical appointments took place in California. Fuentes-Lopez and Garcia also maintained employment in California.

When I consider all of these factors on balance, common sense directs the conclusion that, though L.A.F.G. regularly visited California, she resided in Mexico. This issue presents itself because of the unique nature of Tijuana as a border town and the fact that the members of L.A.F.G.'s family had dual citizenship and could easily cross the border. But the fact that L.A.F.G. frequented California does not make the United States her habitual residence. To borrow the petitioner's analogy, assume a child lives in a home and goes to school in Mesquite, Nevada, a town that is approximately 40 miles from St. George, Utah. St. George has more shops, restaurants, and hospitals than Mesquite, so the child's family regularly travels the 40-ish minutes to avail itself of St. George's offerings. Maybe the family occasionally discusses moving to St. George to be closer to some of those amenities. But when pressed to declare in

which state the family lives, it would be unreasonable to say that they live in Utah when they return to their beds in Nevada every night. Under these circumstances, common sense dictates that one's home is where one sleeps and is enrolled in school, not where one shops and engages in extracurricular activities.

Garcia also contends that Tijuana wasn't L.A.F.G.'s habitual residence because neither she nor Fuentes-Lopez had an intention to reside permanently in Mexico. She testified that the couple moved to Tijuana for the sole purpose of saving money to eventually buy a house in Southern California. Despite that intention to eventually leave Mexico, there is no dispute that the family lived in Tijuana for almost four years before Garcia and L.A.F.G. moved to Nevada. "[W]hatever the parents' intent, habitual residence cannot be acquired without physical presence."[20] Although Fuentes-Lopez, Garcia, and L.A.F.G. were regularly in California and may have intended to move there in the future, it's not genuinely disputed that they lived in Tijuana in July 2022. So I conclude that the minor's habitual residence at the time of removal was Mexico, and Fuentes-Lopez has met his burden to show that she was wrongfully removed.

**C.    The court declines to exercise its discretion to order return because L.A.F.G. is well settled in Nevada.**

Garcia contends that, even if Fuentes-Lopez meets his burden to show that L.A.F.G. was wrongfully removed, the court should not order her return because she is now well-settled in Nevada under Article 12 of the Hague Convention.[21] For that affirmative defense to apply, the respondent must prove by a preponderance of the evidence that the petition for return was filed more than a year after the child's removal and that the child is now settled in her new

---

[20] *Mozes*, 239 F.3d at 1080.

[21] Because I find that Garcia has met her burden on the well-settled defense, I need not and do not address the two other defenses that Garcia has raised.

7

environment.[22] "[A] conclusion as to whether a child is 'settled' in her new environment, though fact-specific, ultimately rests on a legal determination of 'whether the discrete facts add up to a showing' that she is 'settled' within the meaning of Article 12."[23]

To determine whether a child is well-settled in her new country, courts look to factors that show whether she maintains "significant connections to the new country."[24] "These factors include: (1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability."[25] "[O]rdinarily the most important [factor] is the length and stability of the child's residence in the new environment."[26]

Fuentes-Lopez filed his Hague petition in this court more than one year after L.A.F.G. was removed. The parties agree that she was removed in July 2022, but Fuentes-Lopez filed his petition in May 2024.[27] Fuentes-Lopez appears to argue that he filed his petition in time because (1) he filed a "Hague application" in a Mexico court in May 2023; or (2) the one-year time limit started running from a later date because Garcia concealed the removal.[28] But the Hague

---

[22] Hague Convention, art. 12; 22 U.S.C. § 9003(e)(2)(B).

[23] *In re B. Del C.S.B.*, 559 F.3d 999, 1008 (9th Cir. 2009).

[24] *Id.* (quoting 51 Fed. Reg. at 10509).

[25] *Id.* at 1009. Courts may also consider the immigration status of the child and respondent. *Id.* Because Garcia and L.A.F.G. have dual citizenship in the United States and Mexico, I find that this factor does not weigh in any particular direction.

[26] *Id.*

[27] *See* ECF No. 1.

[28] It's unclear from the briefing and arguments at trial whether Fuentes-Lopez actually disputes that he filed his petition within the one-year time period established by Article 12 of the Hague

8

Convention clearly considers only "the date of commencement of the proceedings before the judicial . . . authority of the Contracting State where the child is" as the date that must be within one year of the child's removal.[29] Because Fuentes-Lopez's first Hague application was filed in Mexico when the child was in the United States, the date of that Mexican filing is irrelevant. And the Supreme Court has explicitly held that the Hague Convention's one-year time period cannot be equitably tolled, even if the child's whereabouts were concealed.[30] So I find that Fuentes-Lopez filed his petition with this court almost two years after L.A.F.G. was removed, permitting me to consider whether the child is now settled in her new environment.

It is undisputed that L.A.F.G. has lived in Nevada since she arrived here in July 2022. For three years, she has attended school here. She attended two different elementary schools before starting middle school in the fall of this year. L.A.F.G. had the same teach for both 4th and 5th grade, who testified that L.A.F.G. was an excellent student and that she got a perfect-attendance award in 5th grade. She testified that the child maintains close friendships with at least four students who are now going to middle school together. L.A.F.G. confirmed this information when I interviewed her (in camera but on the record, with counsel and the court reporter present). She added that she's made new friends at her middle school while maintaining her elementary-school friendships. L.A.F.G.'s track coach and Garcia both testified that

---

Convention. Out of an abundance of caution, I address the two contentions that he arguably raised during these proceedings.

[29] Hague Convention, art. 12. Though the parties were engaged in custody proceedings in Nevada state court before Fuentes-Lopez filed his Hague petition in this court, there is no evidence or testimony establishing that he filed any type of Hague petition in those proceedings.

[30] *Lozano v. Montoya Alvarez*, 572 U.S. 1, 10 (2014). To the extent that Fuentes-Lopez contends that he raised Hague Convention arguments in the Nevada state-court case that Garcia initiated when she got to Nevada, I reject that contention. I have reviewed the state-court filings that Fuentes-Lopez submitted, and none of them could be construed to constitute a petition under the Hague Convention.

9

L.A.F.G. is gifted at track and field, attends practice twice a week, and has medaled at recent tournaments held in the United States. L.A.F.G. recounted that she is also active in choir class, and Garcia testified that L.A.F.G. is involved in their church and sings in the church's choir. All of these scholarly and extracurricular pursuits tend to show that L.A.F.G. is now well-settled in her new environment.

Fuentes-Lopez disputes that Garcia has done enough to meet her burden to show that she is able to provide for L.A.F.G. in Nevada. He points to the lack of documentary evidence showing her financial stability or her work history. He also notes that Garcia and L.A.F.G. have lived in three different residences since moving to Nevada, which he suggests shows a lack of stability. Fuentes-Lopez further points to inconsistencies in Garcia's testimony, arguing that she is not a credible witness. And he contends that because Garcia refused to disclose her address, she has not shown that she and L.A.F.G. live in a safe neighborhood and habitable space.

Despite Fuentes-Lopez's objections, I find that Garcia has shown by a preponderance of the evidence that she is financially stable and has gainful employment. She testified that she works as an office manager at a dental office and makes enough money to support herself and L.A.F.G. Before she got that job she was doing temporary work at various dental offices because working as a temp was more lucrative. She also testified that she has enough money in savings to support L.A.F.G. if she loses her current job. Garcia also testified that she was involved in L.A.F.G.'s school and extracurriculars, and L.A.F.G.'s teacher and her track coach corroborated that testimony.

I find that Garcia's testimony about L.A.F.G.'s life in Nevada and Garcia's ability to provide for her daughter is credible. Though Garcia had indicated in court filings years ago that she did not have a strong or stable income, her testimony about her recent temporary

employment and her current work was uncontroverted. And testimony from other adults in L.A.F.G.'s life corroborated that she is able to attend school without incident, travel for track-and-field meets, and spend time with her friends. I find that Garcia did not need to present independent corroboration of her finances to demonstrate that she is able to provide for her daughter.

Nor do I find Fuentes-Lopez's concealment arguments persuasive. Courts may consider an abducting parent's efforts to conceal a child from the other parent if it appears to "prevent the stable attachments that make a child 'settled.'"[31] Fuentes-Lopez contends that Garcia's efforts to conceal her address and the location of L.A.F.G.'s current school are attempts to prevent L.A.F.G. from interacting with her father. He also testified about various instances in which Garcia interfered with his visitation rights.

Fuentes-Lopez's allegations of concealment are materially distinguishable from cases in which the court has rejected a well-settled defense based on concealment. For example, in *Lops v. Lops*, the respondent took his children to the United States without telling their mother or the family court.[32] He took several measures to conceal his location, including owning a house in someone else's name, conducting all of his business in cash, choosing not to obtain employment that could lead to the discovery of their location, and failing to pay federal or state income taxes.[33] For two years the petitioner employed the assistance of several state, national, and international agencies to track the respondent down, to no avail.[34] The Eleventh Circuit upheld

---

[31] *Lozano*, 572 U.S. at 17.
[32] *Lops v. Lops*, 140 F.3d 927, 946 (11th Cir. 1998).
[33] *Id.* at 931–33.
[34] *Id.* at 933.

the district court's finding that the children were not well-settled at least in part because of the respondent's drastic concealment efforts.[35]

Especially when compared to the respondent's actions in *Lops*, I find that Garcia's actions were not taken to conceal L.A.F.G.'s location. Garcia informed the Mexico court less than a month after she relocated that she and L.A.F.G. were in Henderson, Nevada. Though she has concealed her exact address and the name of L.A.F.G.'s school from Fuentes-Lopez, I credit Garcia's testimony that she has fear-based reasons to take those actions. And though her compliance with Fuentes-Lopez's visitation rights has been imperfect, Garcia has largely complied with the visitation requirements ordered by this court[36] and I have no reason to believe that she would not continue to comply if similar requirements were imposed by the court that will ultimately determine the parents' custody rights. I thus cannot conclude that Garcia has concealed L.A.F.G. from Fuentes-Lopez in a manner impacting the well-settled determination, and I find that Garcia has met her burden to show that L.A.F.G. is well-settled in Nevada. So I decline to order the child returned to Mexico.

## Conclusion

IT IS THEREFORE ORDERED that Juan Gregorio Fuentes-Lopez's petition under the Hague Convention on the Civil Aspects of International Child Abduction **[ECF No. 1] is DENIED**. This court declines to exercise its discretion to return the minor child L.A.F.G. to Mexico because she is settled in her new environment. All pending orders related to visitation are dissolved in the interest of having a court of competent jurisdiction decide those matters.

---

[35] *Id.* at 946.

[36] *See* ECF No. 63.

1  IT IS FURTHER ORDERED that Fuentes-Lopez's request for attorneys' fees in this
2 action is DENIED under 22 U.S.C. § 9007(3).
3  IT IS FURTHER ORDERED that the Clerk of Court is directed to **CLOSE THIS**
4 **CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
December 10, 2025

13